IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SCOTT OSBORN,

              Plaintiff,                  **Case No. 2:20–cv–1229**

                                             **Judge Edmund A. Sargus, Jr.**

      **v.**                         **Magistrate Judge Kimberly A. Jolson**

CITY OF COLUMBUS, et al.,

              Defendants.

## <u>OPINION AND ORDER</u>

This matter is before the Court on Defendants Elijah Ladipo, Jesse Smith, Brian Smith, Nicholas Geno, and Ian Wilkinson's (collectively, the "Individual Defendants") Motion for Summary Judgment (ECF No. 25) and Defendant City of Columbus's Motion for Summary Judgment (ECF No. 26). For the following reasons, the Court **GRANTS** the City of Columbus's motion and **GRANTS in part and DENIES in part** the Individual Defendants' motion.

## I.      STATEMENT OF FACTS

This case arises out of Plaintiff Scott Osborn's encounter with several Columbus Division of Police officers on February 13, 2019. While driving in the early morning hours, Mr. Osborn lost control of his vehicle and crashed into another car in a residential neighborhood. (Osborn Aff. ¶ 34, ECF No. 30-1.) His deployed airbags blocked the driver side door so he climbed over to the passenger door. While exiting, his foot was caught and he fell and hit his head on the ground. (*Id.* ¶¶ 35–36.) He was disoriented and stunned from hitting his head but he managed to retrieve his cell phone and called 911. (*Id.* ¶¶ 37–40.)

Defendant Officers Elijah Ladipo and Jesse Smith responded to the scene. (Ladipo Aff. ¶ 8, ECF No. 25-2.) According to Mr. Osborn, he walked to the incoming police vehicle with his

hands in the air and his phone in his hand. (Osborn Aff. ¶¶ 41, 43.) Officer Ladipo did not give

him any commands or allow him to explain what happened. Instead, Ladipo immediately picked

him up with both arms behind his back and threw him face-first to the ground. (*Id.* ¶ 62.) Mr.

Osborn could not catch himself and his face smashed into the street curb. (*Id.* ¶¶ 46–48.)

Officer Ladipo, however, alleges that Mr. Osborn walked "quickly" toward him with his

hand in his pocket, then lifted his hands in the air with an unknown object in his right hand. (Ladipo

Aff. ¶ 12.) A civilian witness told Ladipo that Osborn was at fault in the automobile accident. (*Id.*)

Ladipo alleges that, as Mr. Osborn approached, he said, "back up" and "get to the sidewalk." (*Id.*

¶ 14.) Officer Ladipo shoved Osborn backwards but Osborn looked confused and stepped forward

again. (*Id.*) Ladipo grabbed Osborn's right arm. Osborn tried to pull away. (*Id.* ¶ 17.) Ladipo then

moved Osborn's arm behind his back and performed a takedown maneuver. (*Id.* ¶ 18.) Officer J.

Smith, Ladipo's partner, exited the vehicle and came around the front to help. (J. Smith

Bodycamera.)

After the takedown maneuver, Mr. Osborn avers that he lost and regained consciousness

several times. (Osborn Aff. ¶ 49.) He states that Officers Ladipo and J. Smith told him to put his

hands behind his back but he could not move his arms because they had control of them. He felt a

continuous barrage of punches or kicks to his ribs and head. He tried to pull his arms up to protect

himself. (*Id.* ¶¶ 54–55, 84–89.)

Officer Ladipo claims that Mr. Osborn was actively resisting on the ground by pulling

away from him, rolling onto his back, and kicking his legs. Ladipo "struck Plaintiff twice with a

closed fist in the torso area within a short period of time" and attempted to "hold [Osborn's] head

between his knees." (Ladipo Aff. ¶¶ 19, 21.) Unable to get control of Osborn's head, Ladipo

"placed a knee on Plaintiff's shoulder." (*Id.* ¶ 21.) Officer J. Smith then "struck Plaintiff three

times in the face with a level 4 closed fist punch." (J. Smith Aff. ¶ 15.) As shown on the body camera footage, J. Smith yelled "You're going to get tased. Put your hands behind your back. You're going to get tased." Ladipo said, "tase him," and J. Smith yelled, "taser, taser" before deploying his taser gun for five seconds. (Ladipo Aff. ¶ 22.)

After the first taser deployment, Officer Ladipo pulled Mr. Osborn by one arm off the lawn, over the sidewalk, and into the street. (*Id.* ¶ 23; Ladipo Body Camera Footage.) Ladipo's body camera footage shows that Osborn laid on his side with both arms outstretched in the street. Ladipo knelt on Osborn's upper left shoulder and tried to grab Osborn's arms. The Officers continued to yell "Get on your stomach" and "Put your hands behind your back." Officer J. Smith then yelled, "You're going to get punched. You're going to get punched" and inflicted "five level 4 closed fist punches to Plaintiff's face." (J. Smith Aff. ¶ 19.) A few seconds later, Defendant Officers Brian Smith, Nicholas Geno, and Ian Wilkinson arrived. Officer B. Smith sprayed mace. Officer Ladipo kneeled on Osborn's head and neck with one knee while the other officers struggled to handcuff him. (J. Smith Body Camera.) The officers handcuffed Osborn, tied his ankles together, and tied his ankles to his wrists behind his back with a hobble strap. (Ladipo Bodycamera; Ladipo Aff. ¶ 28.)

Mr. Osborn was subsequently transported to Grant hospital. (Ladipo Aff. ¶ 28.) He suffered seven broken ribs, a concussion, a laceration to his right cornea, bleeding in his eardrum leading to loss of hearing, and contusions to his abdomen and head. (Osborn Aff. ¶¶ 82, 93.) To recover from these injuries, Osborn claims he missed eight weeks of work. He allegedly still suffers from pain in his ribs and memory loss, and he struggles to put words together due to the head trauma. He also was diagnosed with post-traumatic stress disorder from the incident and attends regular appointments with a therapist. (*Id.* ¶¶ 77, 78, 82, 83.)

Mr. Osborn was later charged with obstructing official business and resisting arrest. (Sentence Entry, ECF No. 25-6.) Plaintiff pled "no contest" to and was found guilty by a judge of obstructing official business for this incident. The resisting arrest charge was dismissed. (*Id.*)

On February 13, 2020, Mr. Osborn filed a Complaint in Franklin County Municipal Court against the City of Columbus (the "City") and Officers Ladipo, J. Smith, B. Smith, Geno, and Wilkinson alleging constitutional and state-law violations. (Notice of Removal, ECF No. 1.) Defendants removed the case to federal court on March 6, 2020. (*Id.*) On March 11, 2022, the Individual Defendants filed a motion for summary judgment (ECF No. 25) and City of Columbus filed a motion for summary judgment (ECF No. 26). Plaintiff responded to both motions (ECF Nos. 29, 30) and Defendants replied (ECF Nos. 32, 33). The motions are ripe for review.

## II.     STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–

4

59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III.   CITY OF COLUMBUS'S MOTION FOR SUMMARY JUDGMENT

In his Complaint, Plaintiff asserts four claims against the City of Columbus: (1) malicious prosecution in violation of state law; (2) false imprisonment in violation of state law; (3) intentional infliction of emotional distress in violation of state law; and (4) a *Monell* claim under 42 U.S.C. §1983. (*See generally*, Complaint.) In his response in opposition, Plaintiff voluntarily dismissed his state-law claims against the City. (ECF No. 31 at 4.) The City moves for summary judgment on the remaining *Monell* claim.

A municipality may be held liable under Section 1983 for customs or policies that violate a private individual's constitutional rights. *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 690–91, 94 (1978). To prevail on a *Monell* claim, plaintiffs must establish the existence of a municipality custom or policy, a constitutional violation, and a causal link between the two. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A municipality's customs or policies can take the form of (1) an official policy or legislative enactment, (2) decisions or ratifications of final decision makers, (3) inadequate training or supervision, or (4) a custom of acquiescence to or tolerance of rights deprivations. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). In this case, Mr. Osborn

5

proceeds under the second and third theories—the City ratifies unconstitutional uses of excessive force and inadequately trains and supervises its officers.

### A. Ratification

Under a ratification theory, a single decision can constitute a municipal policy "if that decision is made by an official who 'possesses final authority to establish municipal policy with respect to the action ordered,' which means that his decisions are 'final and unreviewable and are not constrained by the official policies of superior officials.'" *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013) (internal citations omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005)). A final decision maker ratifies a subordinate's action if the decision maker provides "affirmative approval of a particular decision made by [the] subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). In contrast, a decision maker's "mere acquiescence in a single discretionary decision by a subordinate" is insufficient to show ratification. *Id.* Additionally, a plaintiff must "prove that the ratification was a 'moving force' in causing the constitutional violation." *Id.* at 656 n.3 (quoting *Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir. 1991)).

Plaintiff argues that the Columbus Division of Police have a custom or policy of ratifying excessive uses of force by "rubber-stamping" such incidents as reasonable. (ECF No. 31 at 2.) For this contention, Plaintiff relies on his expert, Andrew Scott's, opinion that Columbus Division of Police supervisors "routinely rubber-stamp excessive force and this constitutes deliberate indifference because it contributed to the excessive use of force against Mr. Osborn." (Scott Report ¶ 2.13, ECF No. 30-4.) Scott bases this conclusion on his general experience and knowledge, and the fact that the Columbus Division of Police Internal Affairs Bureau (IAB) reviewed Mr. Osborn's incident and determined that the Individual Defendants' use of force was reasonable.

The limited evidence that the IAB determined the force was reasonable, and Scott's expert conclusion that the City rubberstamps uses of force, are insufficient to establish a genuine issue of material fact under the ratification theory. To show that a single decision constitutes a custom or policy, the plaintiff must show that the decision was made by a person whose decisions are "final" and "unreviewable." *Flagg*, 715 F.3d at 175. Plaintiff fails to provide a particular person who reviewed the incident or show how the IAB, as a whole, should be considered a final decision maker. Furthermore, there is no evidence that the ratification was a "moving force" in Officers' actions. *Feliciano*, 988 F.2d at 656 n.3.

## B. Inadequate Supervision and Training

A municipality's decision not to train or supervise employees regarding "their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see Sweat v. Butler*, 90 F. Supp. 3d 773, 779 (W.D. Tenn. 2015) ("The legal standards for a claim of inadequate supervision and one of inadequate training are essentially the same."). A plaintiff must show "(1) the training or supervision was inadequate for the tasks performed, (2) the inadequacy was the result of the municipality's deliberate indifference, and (3) the inadequacy was closely related to or actually caused the injury." *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014).

The second element, deliberate indifference, "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). A plaintiff ordinarily "must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and

likely to cause injury." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Plaintiff first argues that the City fails to train its officers to properly respond to accident victims with head injuries and is therefore deliberately indifferent to the constitutional rights of its citizens. In support of his inadequate training theory, Plaintiff relies solely on Officers Ladipo and J. Smith's admissions that they did not receive training on how to assess whether or not somebody might have been suffering from a concussion as a result of an accident. (Ladipo Dep. at 16, ECF No. 29-2; J. Smith Dep. at 48–52, ECF No. 29-1.) But this evidence alone, in this particular case, cannot support a reasonable inference that the City acted with deliberate indifference. Plaintiff also does not point to case law that would support a conclusion that officers could have violated a person's constitutional rights in the context of a head injury suffered in a vehicle accident. Without some evidentiary or legal support that the City was aware of or should have been aware of potential issues between its officers and head-injury victims of vehicle accidents, a reasonable juror could not find that the City "disregarded a known or obvious consequence" by failing to train its officers. *See Brown*, 520 U.S. at 410.

Plaintiff's next argument that the City failed to supervise Officer Ladipo is also unsupported. Ladipo's performance evaluations and records of discipline do not document "prior instances of unconstitutional conduct." *See Miller*, 606 F.3d at 255. In a May 2017 performance evaluation, Officer Ladipo's superiors noted that "he has used poor officer safety skills several times" and "has used poor judgment several times during dangerous situations." (Ladipo Dep., Ex. 2.) Ladipo admitted in his deposition that he lost control of his cruiser and hit a tree in August 2017 and backed his police cruiser into a yellow handrail in February 2018 and failed to report it. (*Id.* at 53, Ex. 5.) He was also disciplined for failing to report for duty. (*Id.* at 58.) There is no

evidence, however, that the City "fail[ed] to act in response to repeated complaints of constitutional violations" by Ladipo and the single incident towards Mr. Osborn, even if unconstitutional, cannot alone support Plaintiff's claim. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)); *Doe v. Claiborne County*, 103 F.3d 495 (6th Cir. 1996) ("he cannot rely solely on a single instance" or on one officer's conduct "to infer a policy of deliberate indifference."). Defendant City of Columbus is entitled to summary judgment on Plaintiff's *Monell* claims.

## IV. CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Plaintiff asserts three claims against all Individual Defendants: (1) assault and battery in violation of state law, (2) intentional infliction of emotional distress in violation of state law; and (3) Fourth Amendment excessive force under 42 U.S.C. § 1983. Plaintiff asserts four additional claims against Officers Ladipo and J. Smith: (1) malicious prosecution in violation of state law, (2) false imprisonment in violation of state law, (3) Fourth Amendment malicious prosecution under 42 U.S.C. § 1983, and (4) Fourth Amendment false imprisonment under 42 U.S.C. § 1983. In his response to Defendants' Motion for Summary Judgment, Plaintiff voluntarily dismisses his claims against Officers Geno and Wilkerson. (ECF No. 30 at 22.) The remaining Individual Defendants, Officers Ladipo, J. Smith, and B. Smith, move for summary judgment on all claims.

At summary judgment stage, a government official is entitled to qualified immunity from claims under 42 U.S.C. § 1983 "unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "the contours of the right [are] sufficiently clear [so] that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Hope*

*v. Pelzer*, 536 U.S. 730, 739 (2002) ("the unlawfulness must be apparent"). "The ultimate burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity." *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1999). For each of Plaintiff's §1983 claims below, the Court analyzes whether Defendants are entitled to qualified immunity.

### A. Excessive Force

The Fourth Amendment protects a person's right to be free from "unreasonable seizures," including the right to be free from excessive force by police during a seizure. *Graham v. Connor*, 490 U.S. 386, 394–97 (1989). To decide whether the force was excessive, courts consider: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017). Courts must look at the totality of the circumstances and judge "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### 1. Officer Ladipo's Initial Takedown

Analyzing the three factors set out by the Sixth Circuit, the Court finds a genuine issue of material fact as to whether Officer Ladipo's initial takedown maneuver constituted excessive force. First, the crime at issue, if there was an initial crime at all, was not severe. Officers Ladipo and J. Smith responded to 911 call about a motor vehicle accident. Officer Ladipo admits that he did not initially seek to arrest Mr. Osborn. The takedown occurred when Ladipo had, at most, reasonable suspicion—not probable cause—to detain Mr. Osborn because of the vehicle accident. *See Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) ("the fact that a plaintiff in a §1983 suit had committed no crime [when the officer first used force against him] clearly weighed against a finding of reasonableness."); *Wright v. Euclid*, 962 F.3d 852, 866–67 (6th Cir. 2020) (finding the

first *Graham* factor weighed against defendant officer because "at no point before [the officer] began to seize [plaintiff] did [he] have probable cause to arrest him.") Even if the Ladipo had probable cause to believe that Plaintiff had committed a crime, reckless driving is not considered a severe crime and is within the "lowest rung of unlawful activity." *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019). The first factor lands squarely in Plaintiff's court.

Second, there is a genuine issue as to whether an officer would reasonably consider Mr. Osborn an immediate threat to his and other persons' safety. On route to the accident, a passing driver informed Officers Ladipo and J. Smith that someone at the scene was causing a disturbance. When they arrived, the Officers did not know Osborn was the person accused of causing a disturbance, although Ladipo observed "a commotion between Plaintiff and others on scene." According to Ladipo, Osborn approached him "quickly" with his hands in his pockets and then in the air holding an unknown object. He alleges that he told Osborn to "back up" and shoved him. Then, after Osborn had a "blank stare and began to approach again," Officer Ladipo grabbed Osborn's hand and attempted to pull it behind his back. Osborn tried pull his hand away. Next, as shown on body camera footage, Officer Ladipo performs a takedown maneuver, still holding at least one of Osborn's arms. Mr. Osborn alleges that Lapido slammed him face-first onto the ground immediately and did not give any verbal commands. The body camera audio does not begin until after the takedown but it shows that Ladipo performing the takedown within two seconds of Osborn walking up to him. A reasonable jury could find, based on the totality of the circumstances and viewing these facts in Mr. Osborn's favor, that a reasonable officer would not have viewed Osborn as an immediate safety threat.

The third factor, whether Mr. Osborn resisted arrest or evaded arrest by flight when Officer Ladipo performed the takedown, also weighs in Osborn's favor when taking the facts in a light

11

most favorable to him. Again, Officer Ladipo did not intend to arrest Osborn when he arrived at the scene. Ladipo states that he decided to detain Plaintiff after he "observed a commotion between Plaintiff and others on scene," Plaintiff "was not responding to verbal commands" and Plaintiff approached him "with an unknown object in his hand" and did not listen to his directions to back up. Notably, Officer Ladipo does not claim that he announced that Osborn was under arrest, would be detained, or should put his hands behind his back. Instead, he said, "get back," and performed the takedown one or two seconds later. A reasonable juror could find that Mr. Osborn was not resisting arrest because he did not know he was under arrest, he did not receive any commands to put his hands behind his back or back up and did not have time to react before Officer Ladipo grabbed him and performed the takedown.

Accepting Mr. Osborn's version of the facts, Officer Ladipo's takedown violated a clearly established right to be free from strong physical force absent any directions or commands from the police officer. *See, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (denying qualified immunity where the officers attempted to take the plaintiff's jewelry and belt, the plaintiff stepped back and verbally objected, then without warning or further instruction, the officers immediately "kicked [plaintiff's] leg out from under him and pushed him in the back, causing him to fall and hit his head"); *Richards v. Cnty. Of Washtenaw*, 818 F. App'x 487, 492–93 (6th Cir. 2020) (denying qualified immunity where it was disputed whether the officers issued verbal commands or allowed the plaintiff time to comply with commands before performing a takedown).

Even though Mr. Osborn admits to pulling his hand away when Officer Ladipo grabbed it, the subsequent takedown may have been unreasonable in light of minimal, passive resistance. In *Smith v. City of Troy*, police officers attempted to arrest the plaintiff while he was experiencing an epileptic seizure. 874 F.3d 938, 942–45 (6th Cir. 2017) (per curiam). The police officers thought

12

the plaintiff was under the influence. When they tried to pry the plaintiff's fingers from a fence and the plaintiff responded by pulling his arm away, the officer forced the plaintiff to the ground and wrestled with him until a second officer arrived and deployed his taser. The Sixth Circuit reversed the district court's grant of qualified immunity because a reasonable juror could conclude that, in pulling his arm away, the plaintiff's resistance was "minimal" and the force used was "excessive." *Id.* at 945. The Sixth Circuit concluded that "[i]f [plaintiff] indeed had committed no crime, if he was unarmed, and if no evidence was adduced that he posed a threat to himself or to others, [the officer's] forcible handcuffing of him would be excessive and in violation of well-established constitutional principles." *Id.* Here, as in *Smith*, a reasonable juror could find that a reasonable officer would not perform a takedown maneuver in response to someone pulling their arm away from the officer's grasp.

### 2. Officer Ladipo and J. Smith's Use of Taser and Initial Closed Fist Strikes

After the takedown, body camera footage shows Officers Ladipo and J. Smith struggling with Osborn on the ground and yelling, "put your hands behind your back." Mr. Osborn contends that the Officers controlled both of his arms and he could not roll onto his stomach. He tried to pull his arms up to protect himself because they were punching his head and abdomen. The Officers contend that Mr. Osborn tried to kick them and refused to put his hands behind his back.

It is undisputed that Officer Ladipo struck Osborn twice with a closed fist in the torso area. Ladipo attempted to hold Osborn's head between his knees but was unable to get control of his head so he kneeled on Osborn's shoulder. Meanwhile, Officer J. Smith punched Mr. Osborn three times in the face and tased Osborn for five seconds. After the first taser deployment, Officers Ladipo's and J. Smith's body camera footage shows Ladipo pulling Mr. Osborn on his stomach

by one arm off the lawn and into the street. Osborn lay on his right side with both arms outstretched in Ladipo's grasp. Officer J. Smith yells a second warning and tases Osborn again.

Mr. Osborn has a clearly established constitutional right not to be tasered if he displays passive resistance or no resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (noting that while active resistance to an officer's command can justify use of a taser, passive resistance—or no resistance at all—does not justify such use of force) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)). He also has a clearly established constitutional right not to be tased and punched for failing to follow directions if he is not under arrest and the officer does not reasonably believe he is a safety threat. *See Wright*, 962 F.3d at 868–69 ("[A]n officer may not tase a citizen not under arrest merely for failure to follow the officer's orders when the officer has no reasonable fear for his or her safety."). Based on the body camera footage and Mr. Osborn's version of the facts that he was not resisting and did not display threatening behavior, a reasonable juror could find that Officers Ladipo and J. Smith violated Mr. Osborn's constitutional rights by tasering him twice, punching him in the head and abdomen, and dragging him into the street.

### 3. Officer J. Smith's Final Closed Fist Strikes and Officer Ladipo's Kneeling on Plaintiff's Head

After the second tasing, Mr. Osborn remained on his side in the street. Officer J. Smith's body camera shows Officer Ladipo kneeling on Osborn's shoulder and holding Osborn's arms. The Officers continued to yell "Get on your stomach" and "Put your hands behind your back." Officer J. Smith punched Osborn's face five times. At that point, more police officers arrived. Officer Ladipo knelt on Mr. Osborn's head and neck with one knee while the others applied handcuffs and a hobble strap.

14

Again, Mr. Osborn argues that he was not resisting, he could not roll over because the Officers were kneeling on his shoulder while he was on his side, he could not move his arms behind his back because the Officers controlled his arms, and he was going in and out of consciousness. A reasonable juror could find that the Officers violated his constitutional rights by continuing to use strong physical force without giving him the opportunity to comply. *See Harris*, 583 F.3d at 362 (denying qualified immunity based on the plaintiff's version of facts that the defendant performed a takedown maneuver after the plaintiff failed to comply with his command to kneel down even though another officer prevented the plaintiff from kneeling by forcibly pulling his arms up); *Richards*, 818 F. App'x at 492–93 (finding the same where it was disputed whether the officers allowed the plaintiff time to comply with commands before using additional force).

### 4. Officer B. Smith's Use of Pepper Spray

Officer B. Smith responded to the scene in response to an officer-in-trouble call and observed Officers Ladipo and J. Smith engaged in a struggle with Mr. Osborn on the ground. He deployed mace towards Plaintiff and helped the other two officers put him in handcuffs. (ECF No. 33 at 10.) In his response in opposition to the motion for summary judgment, Plaintiff does not assert that Officer B. Smith used excessive force. Plaintiff mentions Officer B. Smith only twice in the brief in the section on state law claims. (*See* ECF No. 30 at 21.) Because Plaintiff does not set forth facts or arguments concerning whether B. Smith violated Plaintiff's constitutional rights, the Court finds that Plaintiff has not met his burden and B. Smith is entitled to qualified immunity on the excessive force claim. *See Wegener*, 933 F.2d at 392 ("[t]he ultimate burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity.").

### B. False Imprisonment/Arrest

15

To establish a false arrest, also known as false imprisonment, claim under Section 1983 and Ohio law, "a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake,* 412 F.3d 669, 677 (6th Cir. 2005); *Lewis v. City of Cleveland*, No. 1:13 CV 589, 2015 WL 5920172 (N.D. Ohio Oct. 8, 2015) (noting that false imprisonment is the same standard under federal and Ohio law). An officer has probable cause when, at the time of that arrest, "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

If the plaintiff has an underlying state court criminal conviction for the conduct for which he was arrested, however, he is barred from asserting a false arrest claim under Section 1983 or Ohio Law. *See McElrath v. City of Cleveland*, No. 1:16 CV 2907, 2017 WL 3189477 (N.D. Ohio July 26, 2017) ("a guilty finding, whether by trial or plea, constitutes an absolute defense for false imprisonment.") (citing *Walker v. Schaeffer*, 854 F.2d 138, 143 n.1 (6th Cir. 1988). As the Supreme Court explains:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (footnote omitted). "*Heck* bars § 1983 plaintiffs from advancing claims that, if successful, would necessarily imply the invalidity of a prior conviction or sentence." *Cummings v. City of Akron,* 418 F.3d 676, 682 (6th Cir. 2005) (internal quotation marks and citation omitted).

16

For purposes of *Heck*, a no contest plea is a plea of guilty that constitutes a criminal conviction. *See United States v. McMurray*, 653 F.3d 367, 381 (6th Cir. 2011) (overruled on other grounds) ("For a conviction resulting from an Alford-type guilty plea, the defendant has necessarily admitted to the elements of the charge but not necessarily the underlying factual basis"); *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) ("We hold today that there is no difference in the requirements of Fed. R. Crim. P. 11(f) for a defendant who pleads guilty and admits to acts constituting the crime and a defendant who pleads guilty but who either 1) affirmatively protests his innocence or 2) refuses to admit to acts constituting the crime").

Here, it is undisputed that Plaintiff was charged with obstructing official business and resisting arrest in Franklin County Municipal Court. Plaintiff pled "no contest" to obstructing official business and was found guilty. Consequently, Plaintiff's obstructing official business conviction bars his false arrest claim because a finding that he was falsely arrested would imply the invalidity of his state law conviction. Defendants are entitled to summary judgment on the false arrest/imprisonment claims.

C. **Malicious Prosecution**

For the same reasons, Plaintiff's malicious prosecution claims are also barred by *Heck*. To establish a Fourth Amendment malicious-prosecution claim under §1983, a plaintiff must demonstrate that: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). Under Ohio law, a Plaintiff asserting a malicious prosecution claim must show: (1) the officers had "malice in instituting or continuing the prosecution," (2) there was

17

no probable cause, and (3) the criminal proceeding was terminated in the plaintiff's favor. *Trussell v. GMC*, 53 Ohio St.3d 142, 144, 559 N.E.2d 732 (1990).

Since Plaintiff was found guilty of obstructing official business in Franklin County Municipal Court, the criminal proceeding was not resolved in his favor according to *Heck* and his federal and Ohio malicious prosecution claims must be dismissed. *See, e.g.*, *Lassen v. Lorain Cnty., Ohio*, No. 1:13 CV 1938, 2014 WL 3511010, at *5 (N.D. Ohio July 14, 2014) (granting summary judgment to defendant police officers on Fourth Amendment malicious prosecution claims where the plaintiff pled "no contest" and was found guilty of assault in state court); *Courtney v. Rice*, 46 Ohio App. 3d 133, 136–37, 546 N.E.2d 461 (Ohio Ct. App. 1988) (a guilty finding in a criminal case bars an action for false arrest or imprisonment); *Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 561 (6th Cir. 2010) (citing *Walker v. Schaeffer*, 854 F.2d 138 (6th Cir. 1988) (plaintiff's no contest plea in state court collaterally estopped pursuit of § 1983 action for false arrest based upon lack of probable cause for arrest as she conceded existence of probable cause in no contest plea)). As the *Jackim* court explained, "Plaintiff had the option of insisting upon a trial where [his] acquittal would have cleared the way for this lawsuit. [He] chose to forego [his] opportunity to litigate it by pleading no contest, and is precluded from taking a different position in this forum." 378 F. App'x at 562. Here, for the same reasons, Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claims.

   **5.  <u>Assault and Battery, Intentional Infliction of Emotional Distress</u>**

Officers Ladipo, J. Smith, and B. Smith move for summary judgment on Plaintiff's assault, battery, and intentional infliction of emotional distress claims on the grounds that they qualify for state statutory immunity. Under Ohio law, employees of political subdivisions, including police officers, are statutorily immune from tort liability unless:

(a) their acts or omissions were manifestly outside the scope of their employment or official responsibilities;

(b) their acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

(c) civil liability is expressly imposed upon them by some other section of the Ohio Revised Code.

R.C. § 2744.03(A)(6).

The statute creates a presumption of immunity, and Plaintiff must provide sufficient evidence to rebut it with one of the three statutory immunity exemptions. *See Cook v. Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio App. 1st Dist., 1995). In this case, only the second exemption potentially applies because the Officers' conduct was within the scope of their employment and civil liability is not expressly imposed by another section of the Ohio Revised Code. Thus, to defeat state statutory immunity, Plaintiff must show a genuine issue as to whether the Officers acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 2744.03(A)(6)(b).

At summary judgment stage, the Sixth Circuit has held that the state immunity defense "stands or falls with [the] federal qualified immunity defense." *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018). That is, whether Officers Ladipo and J. Smith acted in an objectively reasonable manner is based on the same disputed facts that determine whether they acted with "with malicious purpose, in bad faith, or in a wanton or reckless manner." *See Chappell v. City of Cleveland*, 585 F.3d 901, n.3 (6th Cir. 2009); *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) ("As resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims."). Officers Ladipo and J. Smith are not entitled to state statutory immunity because they were not entitled to

19

qualified immunity. Defendants do not challenge the assault, battery, and intentional infliction of emotional distress claims on alternate grounds. These claims proceed to trial.

Officer B. Smith, however, is entitled to state statutory immunity. There are insufficient facts showing that he acted in an objectively unreasonable manner as required for federal qualified immunity, and insufficient facts to establish a genuine issue that he acted with malicious purpose, in bad faith, or in a wanton or reckless manner as required for state statutory immunity. *See Hopper*, 887 F.3d at 760.

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant City of Columbus's Motion for Summary Judgment (ECF No. 26). The Court further **GRANTS in part and DENIES in part** the Individual Defendants' Motion for Summary Judgment (ECF No. 25). Specifically, the Court **GRANTS** summary judgment on Plaintiff's malicious prosecution claims, false imprisonment/arrest claims, and all claims against Officer Brian Smith. The Court **DENIES** summary judgment on Plaintiff's § 1983 excessive force claims and state-law claims against Officers Ladipo and J. Smith. Plaintiff voluntarily dismisses his claims against Officers Geno and Wilkinson. Therefore, Defendants City of Columbus, Brian Smith, Nicholas Geno, and Ian Wilkinson are dismissed from the case. This case remains open.

**IT IS SO ORDERED**.

June 15, 2022                                    /s/ Edmund A. Sargus, Jr.
**DATE**                                            **EDMUND A. SARGUS, JR.**
                                                          **UNITED STATES DISTRICT JUDGE**